IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| KOGER MANAGEMENT GROUP, INC., | ) |
| Plaintiff, | ) |
| v. | ) 1:08cv301 (LMB/JFA) |
| CONTINENTAL CASUALTY CO., et al., | ) |
| Defendants. | ) |

MEMORANDUM OPINION

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a) in this dispute between an insured and its insurance companies. The specific dispute centers on whether the defendant insurance companies may rescind the crime insurance policies issued to plaintiff because of an allegedly false statement made in the original insurance application. The defendants have stipulated that if they are not entitled to rescind the policies, they will pay plaintiff the $1,000,000 policy limit.

I. Procedural Background

Plaintiff, Koger Management Group, Inc. ("KMG"), filed a complaint against defendants, Continental Casualty Company and Continental Insurance Company (together "CNA"),[1] seeking a

---

[1] Continental Insurance Company issued the first policy covering 2003-2004 and also issued the renewed policy covering 2004-2007.  Continental Casualty Company issued the renewal of the policy for 2007-2008.  Continental Insurance Company is a wholly owned subsidiary of Continental Casualty Company.

declaration that CNA was not entitled to rescind the crime insurance policies issued to KMG and that CNA was liable for the $1,000,000 policy limit pursuant to the 2004-2007 insurance policy.[2] CNA filed a one-count counterclaim, seeking a declaration that it was entitled to rescind the insurance policies because they were issued in reliance on materially false information in the original application.

## II. Discussion

### A. Factual Background

Robert Koger founded KMG and, along with his wife, has owned it for 33 years. During this time, Robert Koger has continuously served as President of KMG, which is a homeowners' association management company operating in Virginia, Maryland, West Virginia, and the District of Columbia. As part of its management activities, KMG engaged in numerous financial activities on behalf of its clients. To facilitate these transactions, KMG opened a unique bank account for each homeowners' association. KMG referred to these accounts as "Clients' Accounts." The operation of a client account was relatively straightforward: KMG opened the bank account, collected and deposited dues from the homeowner members of the association into the account, and withdrew money from the account

---

[2] KMG also sought attorneys' fees under Section 38.2-209 of the Virginia Code, claiming that CNA acted in bad faith in deciding to rescind the policies. On August 19, 2008, this Court granted defendants' Motion for Partial Summary Judgment on the plaintiff's claim for attorneys' fees.

2

to pay the association's vendors or to make investments for the benefit of the association. KMG's accounting department accepted the member dues and printed deposit slips or checks for the associations. A separate KMG employee, Doug Stewart, reconciled the Clients' Accounts. In addition, each homeowners' association generally hired its own accountant to audit its individual account.

In approximately 2001, one of the association clients asked KMG if their homeowner members could pay their association fees with credit cards or through automatic withdrawals from their checking accounts. To accommodate this increasingly popular payment arrangement, KMG set up a special account called the "Transfer Account." This account primarily functioned as a holding account for credit card and automatic withdrawal payments until KMG transferred the payments into the specific client account for which the payment was intended. When a homeowner paid an association fee by credit card or automatic withdrawal, KMG first recorded the payment by the homeowner and deposited the credit card or automatic withdrawal payment directly into the Transfer Account. The funds would then be moved out of the Transfer Account and deposited into the corresponding homeowners' association client account on a monthly basis. To make these transfers, KMG employees manually entered each homeowners' association account number and the amount due to that account into a spreadsheet. Then, Jeffrey Koger, Robert Koger's son and

the Chief Financial Officer of KMG, uploaded that data into software that directed an electronic transfer from the Transfer Account into the association account. During the entire time transfers were made in and out of the Transfer Account, Jeffrey Koger was the only KMG employee who was able to make those electronic transfers.[3] In addition, Jeffrey Koger was able to, and did, transfer funds out of the Clients' Account into the Transfer Account to facilitate purchases for the association.

B.   **The Insurance Policy Application**

As KMG's business grew, the company expanded and hired more employees. To protect against employee theft, KMG began purchasing crime insurance sometime in the mid-1990s. In 2001, KMG's insurance agent, Tom Welch, suggested that KMG increase its crime insurance policy limit to $1,000,000. Robert Koger followed this advice and completed a new application for crime insurance with the Chubb Group. Welch testified at trial that he thought, but did not specifically remember, that he reviewed the 2001 crime insurance application and its questions with Robert Koger. In 2003, the Chubb Group stopped renewing its crime insurance policies. Working through broker Ian H. Graham Insurance, Welch recommended that KMG purchase a policy issued by CNA. Robert Koger agreed, and a CNA application was sent to KMG.

---

[3] Disbursements from the Transfer Account could also be made by checks. Although Robert Koger had the authority to draw checks on the account, only Jeffrey Koger had the authority to make electronic withdrawals.

4

The application at issue in this litigation was titled "Property Managers Errors & Omissions and Commercial Crime Application" and served as an application for both crime insurance and errors and omissions coverage.[4]  Central to this litigation is Robert Koger's answer[5] to Question 5 on page 4 of the application, which asked:

> Are bank accounts reconciled by someone not authorized to deposit or withdraw therefrom?

The application was marked "Yes" in response to this question.

After receiving the application, CNA's Underwriting Department approved the issuance of a policy, and Continental Insurance Company issued crime insurance (Policy No. 267876704) to KMG for the period from May 1, 2003 through May 1, 2004.  The policy had a $1,000,000 limit per occurrence and was subject to a $10,000 deductible.  It covered thefts of money, securities, and property by KMG employees that resulted in KMG sustaining a loss.  In 2004, the policy was renewed on the same terms for the period May 1, 2004 to May 1, 2007.  No new application for commercial crime insurance was required from KMG before the 2004 renewal because the policy met the following criteria for automatic renewal:  1) policy liability limit of no more than $1,000,000,

---

[4] Crime insurance covers thefts of company property by employees, and errors and omissions insurance covers thefts of clients' property by employees.

[5] Testimony at trial revealed that Jeffrey Koger actually completed the majority of the 2003 application, but the parties agree that Robert Koger reviewed the application and signed it on April 16, 2003.

2) total premium of no more than $15,000, and 3) no claims submitted. After the rescission investigation was initiated, the policy was renewed for 2007-2008 on different terms.

In 2006, KMG discovered that Jeffrey Koger had embezzled over $2,000,000 from the Transfer Account by electronically transferring funds from the Transfer Account into bank accounts that he and his wife managed. These thefts went undetected for so long primarily because Jeffrey Koger was solely responsible for managing the Transfer Account. On April 16, 2007, Robert Koger submitted a claim for approximately $1,000,000 under KMG's 2004-2007 crime insurance policy with CNA. Upon learning more about the loss and the length of time over which it occurred, CNA began considering the possibility of rescission. CNA decided that it was entitled to rescind the crime policies after it learned that at least one person had dual authority to reconcile and to deposit into or withdraw from the Transfer Account and the Clients' Accounts. CNA asserted that this dual authority made the answer to Question 5 false and that the misrepresentation was material to the initial decision to issue the policy. KMG brought this suit to enforce the policy.

C. **The Key Factual Issue**

Defendants argue that the answer to Question 5 was false with regards to the Transfer Account because Robert Koger reconciled that account and had authority to deposit and withdraw from it. Plaintiff does not dispute that Robert Koger had such

6

dual authority. Plaintiff, however, maintains that when Robert Koger answered Question 5 he believed the bank accounts to which it referred were the Clients' Accounts, for which the answer was true. Defendants respond that the Question included the Transfer Account, but even if it did not, the answer was also false as to the Clients' Accounts because: 1) Jeffrey Koger reconciled three Clients' Accounts from which he had the authority to make withdrawals; 2) Jeffrey Koger played a supervisory role over reconciliations of Clients' Accounts from which he also had the authority to make withdrawals; and 3) all employees at KMG could deposit into Clients' Accounts, so any employee who reconciled Clients' Accounts also had the authority to deposit into the accounts.

### III. Applicable Legal Standard

In Virginia, an insurance company seeking rescission must clearly prove that a statement in the application was 1) material to the risk assumed and 2) untrue. Va. Code Ann. § 38.2-309. However, when, as here, the application also includes language requiring that the applicant attest to the truth of the statements to the best of his knowledge,[6] the insurance company must also clearly prove that the answer was "knowingly false."

---

[6] Page 5 of the April 2003 application stated, "[t]he undersigned declares that to the best of his/her knowledge the statements set forth herein are true and correct and that reasonable efforts have been made to obtain sufficient information from all of the insured Persons to facilitate the proper and accurate completion of this application for the proposed policy."

7

Old Republic Life Ins. Co. v. Bales, 195 S.E.2d 854, 856 (Va. 1973); Parkerson v. Fed. Home Life Ins. Co., 797 F. Supp. 1308, 1315 (E.D. Va. 1992).[7] This is a subjective standard, but the applicant's "subjective state of mind must be reasonable in light of the objective facts." Parkerson, 797 F. Supp. at 1317. Under this established law, to succeed on a rescission claim, the defendants must clearly prove that the statement at issue was material, that is was false, and that the insured knew the statement was false.

A. Materiality

KMG argued at trial that the answer to Question 5 was not material to the issuance of the original policy because there were discrepancies between CNA's underwriting guidelines and the application for crime insurance. KMG also argued that the answer to Question 5 was not material to the issuance of the 2004-2007 renewal policy because CNA automatically renewed the policy without requiring additional information from KMG. These arguments have no merit.

Under Virginia law, a statement in an application for insurance is material to the risk assumed if it reasonably influenced the insurance company's decision to issue the policy. See Times Ins. Co. v. Bishop, 425 S.E.2d 489, 492 (Va. 1993). At

---

[7] At trial, KMG argued that the terms of the policy required CNA to show that Robert Koger intended to defraud the company before it was entitled to rescission. This contention is unsupported by the terms of the policy and relevant caselaw.

8

trial, CNA's Assistant Vice-President for Underwriting, Kay Weston, and the underwriter for KMG's crime policies both testified that CNA would not have issued a crime policy to KMG in 2003 if Question 5 had been answered in the negative. They explained that segregation of duties, about which Question 5 inquired, protects against embezzlement and false deposits by employees. Specifically, Weston testified that segregation of duties had to be in place before a crime policy was issued. The testimony of the CNA witnesses clearly demonstrated that the answer to Question 5 reasonably influenced their decision to issue KMG's first crime policy in 2003.

The answer to Question 5 also reasonably influenced CNA's decision to issue a renewal of that policy to KMG in 2004. Weston testified that CNA relied on the information in the original application in deciding whether to renew a policy. She stated that neither an original policy nor a renewal would have been issued if Koger answered "No" to Question 5.

Accordingly, CNA clearly proved that the answer to Question 5 was material to its decision to issue the crime policies.[8]

B.   Falsity

Next, an insurance company seeking rescission must clearly prove that the insured answered a question on the application

---

[8] At trial, defendants repeatedly referenced Jeffrey Koger's "verification" in August 2003. This so-called "verification" is irrelevant to the instant civil action because the verification was part of an application for Errors & Omission insurance, which is not at issue here.

9

falsely. See Times Ins. Co., 425 S.E.2d at 491-92. Question 5 asked whether "bank accounts" were reconciled by someone who was not authorized to deposit or withdraw from the accounts. The Court finds that the answer "Yes" was false as to the Transfer Account because Robert Koger reconciled the Transfer Account and was authorized to withdraw from it in 2003.[9] The answer was also false as to the Clients' Accounts because the testimony of Doug Stewart established that Jeffrey Koger was solely responsible for reconciling three of the Clients' Accounts and that in the 2003 time period he was also authorized to withdraw from these accounts through electronic transfers. Therefore, CNA met its burden of clearly proving that the answer to Question 5 was false.

C. Knowingly False

In light of this finding, the Court must determine whether Robert Koger knowingly gave a false answer to Question 5 as he understood it. As CNA correctly argues, Robert Koger's subjective understanding of the question does not determine its meaning. His subjective understanding does, however, affect the inquiry into whether he knowingly gave a false answer. Cf. Parkerson, 797 F. Supp. at 1317-18. In the majority of the cases addressing the "knowingly false" standard, the insured understood the terms of the question, but arguably gave a false answer based

---

[9] Robert Koger also testified at trial that if "bank accounts" in Question 5 did refer to the Transfer Account, the correct answer would have been no.

10

on the applicant's knowledge of the facts when he answered the question. See, e.g., Mutual of Omaha Ins. Co. v. Echols, 154 S.E.2d 169, 172 (Va. 1967). The "knowingly false" standard, however, also applies to cases in which the applicant misunderstands the question, but answers truthfully based on his understanding of the facts. Cf. Parkerson, 797 F. Supp. at 1318 (discussing, but rejecting, the possibility that the applicant misunderstood the question at issue). If the insured misinterprets a question, but answers it truthfully based on his understanding of the question, he has not knowingly given a false answer. Cf. Sterling Ins. Co. v. Dansey, 81 S.E.2d 446, 451 (Va. 1954) ("[A]n incorrect statement innocently made in the belief in its truth will not avoid the policy . . . .") (internal quotations and citations omitted).

1. **Robert Koger's Interpretation of Question 5**

Robert Koger testified that he misunderstood Question 5 on the crime policy application, believing that the phrase "bank accounts" in the question referred to the Clients' Accounts, not to KMG's own accounts, which included the Transfer Account. He explained that he came to this conclusion because the questions immediately preceding Question 5 in the application all referred to client-related matters. Specifically, Question 3 asked about the collection process for the Clients' Accounts, and Question 4 asked about checks for the Clients' Accounts.

Robert Koger was a credible witness. His testimony

11

explaining why he believed Question 5 referred to Clients' Accounts was plausible and consistent with other evidence in the record. Of particular significance is Robert Koger's answer to Question 4 on the same page as Question 5, regarding check issuance. Question 4-b asked, "Is a countersignature required on all checks?" In response, Robert Koger answered that a countersignature was required on all checks in excess of $1000. In fact, the evidence established that a countersignature was required for checks over $1000 drawn from Clients' Accounts, but was not required for checks of that amount drawn from KMG accounts. Robert Koger's answer to Question 4-b supports his assertion that he believed Question 5 addressed the Clients' Accounts.

Additionally, Robert Koger's misinterpretation of Question 5 was not unreasonable. Evidence at trial demonstrated that other similarly situated applicants had made the same mistake in answering Question 5. See Parkerson, 797 F. Supp. at 1318 (considering it relevant whether an average person might misunderstand the question). KMG's insurance agent, Welch, testified that two of his other association management company clients had also misunderstood Question 5 on CNA's application, believing it asked about how they handled the homeowners' associations accounts, not how they handled their own accounts. Thus, Robert Koger was not the only applicant who misunderstood the scope of Question 5.

Moreover, the wording of Question 5 is confusing and imprecise. The language of Question 5 does not limit itself to specific accounts, for example, by asking about "the insured's accounts," and neither are "bank accounts" modified by the words "all" or "every." Although CNA argued that the nature of the crime insurance for which Koger was applying, that is coverage for KMG's own accounts, should have alerted Robert Koger that the question was asking about KMG accounts, which included the Transfer Account, the application doubles as an application for both crime insurance (which insures the company's own accounts) and errors & omissions insurance (which insures the clients' accounts), and it is not entirely clear to which "accounts" Question 5 is referencing.

Furthermore, from the structure of the application, it was reasonable for Robert Koger to conclude that Question 5 referred to the Clients' Accounts. For example, Section IV of the application asks questions about the properties managed by the applicant and activities the applicant undertakes in managing those properties. Questions in the next section, V, also ask about client-related activities: the coverage requested, the location of properties, the collection process for rents, and check issuance. Question 5 appears in Section V. On the basis of this evidence, the Court concludes that Robert Koger intended his answer to Question 5 to relate to the Clients' Accounts, not the Transfer Account.

## 2. Jeffrey Koger Reconciled the Clients' Accounts

At trial, CNA argued that even if Robert Koger believed Question 5 referred to the Clients' Accounts, the answer was knowingly false because he knew that Jeffrey Koger reconciled three of the Clients' Accounts from which Jeffrey Koger was also authorized to make withdrawals. The evidence at trial showed that Robert Koger hired Doug Stewart to reconcile the Clients' Accounts. Although Stewart testified that Jeffrey Koger reconciled the Sequoia, Ashburn Farm, and Preswick association accounts on his own, he also testified that he did not recall telling Robert Koger that Jeffrey Koger was reconciling any of the Clients' Accounts on his own. He also stated that Robert Koger never indicated to him that he knew Jeffrey Koger was reconciling these accounts. Robert Koger testified that he did not know Jeffrey Koger was reconciling any of the Clients' Accounts on his own.

However, the evidence at trial also established that in April of 2003 Jeffrey Koger sometimes assisted with reconciliations of the other Clients' Accounts. Stewart testified that when he had a problem with a reconciliation, he would take it to his supervisor and that if his supervisor could not resolve the issues, Jeffrey Koger would reconcile the account. Two other employees in KMG's accounting department, Meg Gray and Paulette Heiderman Wilson, also testified that, in 2003, problems with reconciliations would ultimately go to Jeffrey

Koger if Stewart or his supervisor could not resolve them. Finally, Robert Koger acknowledged he knew that Jeffrey Koger acted as a "back up" if there were problems with reconciliations. Thus, CNA demonstrated that Robert Koger was aware that Jeffrey Koger reconciled the Clients' Accounts if there were problems his subordinates could not solve.

CNA also established that Jeffrey Koger was authorized to withdraw from the Clients' Accounts in 2003. Robert Koger testified at trial that Jeffrey Koger was the only KMG employee who knew the electronic code for the Transfer Account, and was, therefore, the only employee who could actually make electronic transfers in and out of the Transfer Account. He also stated that Jeffrey Koger could and did transfer money out of the Clients' Accounts and into the Transfer Account on occasion. Thus, Robert Koger knew that Jeffrey Koger was authorized to withdraw from the Clients' Accounts in 2003.

On this record, the defendants have clearly proven that the answer to Question 5 was knowingly false. When he answered Question 5, Robert Koger knew that Jeffrey Koger sometimes reconciled Clients' Accounts when Doug Stewart or his supervisor was unable to reconcile them. He also knew that Jeffrey Koger was authorized to withdraw from the Clients' Accounts. Even though he may have believed he was answering the question truthfully, his awareness of these two facts made his answer to

15

Question 5 knowingly false.  See Parkerson, 797 F. Supp. at 1319; Echols, 154 S.E.2d at 171-72.

IV. Conclusion

For the forgoing reasons, the Court finds that CNA clearly proved that the answer to Question 5 was material, false, and knowingly false when made.  Therefore, the Court finds in the defendants' favor.  An appropriate Order will issue.

Entered this 3rd day of March, 2009.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge